## BENHAM et al. v. THE NIAGARA.

*(District Court, N. D. Ohio, E. D.   January 17, 1891.)*

1. COLLISION—TUGS WITH TOWS—BROKEN RAFT IN RIVER.

The steamer N. was proceeding down the St. Clair river, having in tow a raft of telegraph poles, some 800 feet long and 400 feet wide, properly constructed for navigation in such river, when two schooners collided with the raft and so broke it up that it spread out to the width of nearly 600 feet, and in some places occupied the whole of the channel. The N., however, went her way without attempting to repair the raft, and in the night-time she sighted the tug B. with a tow, just below South-East bend. The master of the N. looked back on his starboard side, and saw what he called "a hole" between the raft and the bank, and he thereupon gave two blasts of the whistle for the B. to pass to starboard, which she proceeded to do after answering. Before the B. could do anything to prevent collision, after discovering the character of the raft, it struck one of the schooners of the B.'s tow, and damaged her. *Held,* that the N. was in fault because her master did not acquaint himself with the dangerous character of the raft and give the danger signal to the B., or hold the raft for repairs at some place where other vessels might pass safely.

2. SAME—NOTICE TO PASSING VESSEL.

The fact that vessels going down the river had warned the B. that there was such a dangerous raft in the river before she met it was not sufficient notice to require her to disregard the N.'s invitation to pass, where such vessels had not described the raft in question so as to enable the B. to distinguish it from any other she might encounter.

In Admiralty.

*Goulder & Lee,* for libelants.

*Henry H. Swan* and *H. M. Gillett,* for respondents.

RICKS, J.   The libel filed in this cause on the 20th day of November, 1889, charges that on the 26th day of August, 1888, the schooner H. C. Richards, properly equipped and skillfully handled, in tow of the steamer Britannic, was proceeding on a voyage from Lake Erie up through the St. Clair river. Said Britannic had in tow, in the order named, and attached by tow lines of the ordinary length, the schooners Woolson and Richards, and at the time of the collision, hereafter described, had proceeded as far as a point in the St. Clair river near and below South-East bend; and while so proceeding, in the night season, the Britannic exchanged with the tug Niagara, then approaching from above and descending the river, passing signals of two blasts, with the appropriate signal for passing to starboard, which signals were exchanged at a proper and appropriate distance, and the said tow and said tug approached each other with no notice to those on the tow that any circumstance existed to make the passage dangerous.   The libel further avers that the Britannic and said tow duly starboarded their helms, and made over to and kept the port-hand side of the channel, and were in proper position to pass.   It further alleges that when the Niagara was passing said tow it was discovered that she had in tow a raft of unusual shape and size, which was occupying substantially the whole channel, and was coming down the channel, towed by the Niagara, with good headway.   The helms of the tow were thereupon starboarded, and they kept in just as close as they could on the port bank, and the Britannic checked down.   It further alleges that there was a dock which made out a little from the shore ahead and on the port bow of the Britannic, and the

Richards ran into the bank below said dock with her helm starboarded, notwithstanding which the raft caught the Woolson, (which was the first vessel in the tow,) and brought her stern down upon the Richards as the latter lay against the bank, tearing out the rail, stringers, and stanchions, and carrying away some of her head-gear and her rigging on the starboard side, and otherwise damaging her. The libel avers that said raft so towed by the Niagara had, a short time previous to meeting the Britannic and tow, been in collision with some other vessel, and been badly broken and disarranged, so that instead of being in the usual and ordinary shape, and of the usual size and condition proper for being towed through said river, the same was unwieldy, and to a considerable extent unmanageable and innavigable, so that it occupied nearly the whole channel at the point of the collision, and was not in ready command of the Niagara and the tug Saugatuck, the other tug astern and attached to said raft, and was not in condition to be towed in that place. The libel avers that the Richards was wohlly without fault, and that the Niagara was guilty of fault in the following respects and particulars: (1) That she was attempting to navigate said river, having in tow a raft not of proper size and condition to be towed through said river, and was not making a reasonable and ordinary use of said river. (2) That having said raft in tow, in its broken, unmanageable, and innavigable condition, she gave no notice of these facts to the approaching tow. (3) That, having such a tow, she exchanged the ordinary passing signals with the Britannic, and continued to approach without warning of the dangerous tow she had. (4) In not stopping the raft by means of the tug at the stern of the raft, and holding said raft over against the bank of the river, and warning approaching craft of the dangerous character and condition of the obstruction when said raft was above South-East bend, where it could have readily been done and said raft put in condition to proceed.

The testimony in this case very clearly establishes all that the libel charges in relation to the unwieldy, unmanageable, and innavigable condition of this raft at the time of the collision. In fact the respondents rather insist, in their presentation of their defense, that the raft was so unmanageable and unwieldly by reason of a previous collision and damage thereto that it could be neither stopped for repairs nor for a more favorable time for descending the river, nor controlled in such a bend as that where this accident took place. The defense seems to rely largely upon their utter helplessness to control the movements of this raft as sufficient reason for not being held liable for injuries caused thereby. This raft was in peculiar shape and form. It was what is known as a "sack raft," and before entering the mouth of the St. Clair river had been prepared for navigating that stream. This was done by forcing the booms of the raft as near together as possible, and then stretching from side to side heavy ropes to hold the booms and raft in position. Within the booms were several thousand telegraph poles of varying sizes, and of the value of $30,000. By these guy-lines the raft was put into navigable form, and is described as being about 800 feet long and 400 wide. In this shape, and under the control of a sufficient number of

tugs, the raft might have been safely towed down through the river; but it appears from a libel filed by the Mackinaw Lumber Company against the Kitty M. Forbes and the schooner Mabel Wilson, in the district court of the United States, at Detroit, that on the 25th day of August, 1888, the said Kitty M. Forbes and schooner Mabel Wilson collided with said raft, first near Faun island and later near Harson's island, in the St. Clair river, and pulled said schooner through said raft, "breaking and widening out the same, and thereby breaking said booms, caused the loss of 4,000 of said poles, and rendered said raft helpless, innavigable, and unmanageable, in which condition it passed down the St. Clair river." This description of the raft, made by the owners themselves, is not exaggerated. This testimony shows that after the collisions referred to the guy-ropes were all broken, one of the booms on the port side of the raft was broken and the other driven under the poles so that they projected over the port quarter of said raft in a tangled and dangerous manner.  The raft, at its widest point, is fixed by some of the witnesses at from four to six hundred feet. In this condition the raft proceeded upon its journey, and at some points in the river substantially occupied the whole channel; and in this condition it approached the South-East bend with the knowledge that vessels were liable to meet it at almost every point of the river.  The mate, who was in charge of the tug Niagara at the time of the collision, admits that he had not examined the raft to ascertain its condition after the collision with the Kitty M. Forbes, neither had he been advised by the rear tug, or the man in charge of the raft, of the damages arising from said collision.  Seeing the Britannic and her tow approaching, he says he went first to the port side of his tug, and looking back saw the port side of the raft dragging along the rushes on the Canada bank, and then, going to the starboard side of the tug, he says he remarked to the watchman: "That fellow [referring to the Britannic and tow] can get through there. There is a hole right through there."  The master's characterizing the passage-way as a "hole" is significant in itself.  Immediately he sounded two blasts of the whistle as an invitation to the Britannic and tow to approach.  It was clearly the duty of the commanding officer of that tug, before the signal was given, to know that there was a sufficient space upon the starboard side of that raft to permit that tow to pass in safety. His signal was an invitation to the steamer to approach, and a notice to her that in the judgment of the master of said tug there was sufficient channel for the tow to pass in safety.  Without undertaking to determine here the legal relations of the tug Niagara and the tug Saugatuck, assisting in navigating that raft at its rear end, or the agent in charge of that raft, I am clearly of the opinion that, primarily, it was the duty of the Niagara to know that a sufficient space in the channel was unobstructed and open to the tow to pass before the two-blast whistle was given.  I am just as well satisfied from the evidence in this case that there was not a sufficient space to have justified the master of the tug in inviting the Britannic to pass.  It was clearly his duty, under the circumstances, to have given a danger signal the moment the head-lights of the Britannic came in view.  That would have been the safe and seaman-like course to pursue.  With such a danger signal the Britannic and her tow could

have safely stopped below the bend at several places, where the raft could have passed without danger. But it is claimed by the proctors for the respondents that the Britannic had notice in fact of the unmanageable and innavigable condition of this raft, and that it was being towed down the river occupying substantially the whole channel. This notice it is not claimed was given by the Niagara or the agent of the raft, but that it was notice given voluntarily by masters of vessels who had passed the raft further up the river, and it does appear from the testimony in this case that the Whitney, in passing down, had notified the master of the Britannic to look out for a raft that was coming down the river; but it is not claimed that this notice was of such a definite and positive character as to give the Britannic and other approaching vessels such a description of the raft as to identify it from other rafts on the river. It was not notice of such character as to justify the respondents in claiming that the Britannic ought to have observed that notice, and disregarded the two-blast signal given by the Niagara, as the vessels approached, which the Britannic had a right to suppose was an invitation and notice that she could pass with safety. When the Niagara pursued her journey down the river with the raft in the condition described, she took upon herself all risks that might follow from such a dangerous course. There was nothing in the law to prevent her making the attempt, but she did it at her own risk and peril, and every injury and loss occasioned by the innavigable and unmanageable condition of the raft she ought in justice to pay. I think, under all the circumstances developed by the testimony in this case, that the master of the Niagara was censurable for proceeding with his journey. He is especially censurable for having failed in sounding the danger signal, or in not giving notice by sending a tug in advance of him, and at a sufficient distance to notify vessels of the character of the raft he had in tow so as to enable them to seek shelter at such places as the river bank afforded, or choose passing places at such points where the width of the river would make it safe for all concerned. If there had been a reasonable channel on the starboard side of the raft, through which the Britannic and her tow could have passed with safety if they had skillfully managed their tow, it might then be proper to consider the claim now made that this collision was caused by the want of care on the part of the Richards. But the master of the Niagara, having deliberately invited the Britannic to try her luck in getting through what he called a "hole," he cannot now claim a slight sheer or change in the course of any of the tow, which he should have known was probable, if not inevitable, because of the insufficient channel through which he induced the tow to pass, as having caused the collision complained of. As I have before stated, the primary and proximate cause of this collision was the innavigable and unmanageable character of that raft, spreading out and substantially occupying the whole channel of the river, and in the Niagara, under such circumstances, inviting the Britannic and her tow to pass under the misleading signals of two blasts, which was in fact a notice that in the judgment of the master of the Niagara the conditions for passing were favorable. This neglect is sufficient to entitle the libelant to recover in

this case, and I do not consider it necessary or proper to consider the other defenses relied upon. It may not be improper for the court here to remark that in view of the great value of the tonnage daily passing through these rivers and canals connecting our lakes, and in the absence of proper legislation, tugs and parties in charge of rafts must be held to a high degree of care,—in the first place as to the proper construction of the rafts, so as to make them manageable and navigable, and in the second place as to proper care and diligence in transporting them through the lakes and rivers, with reference not only to the time and character of the weather when they shall undertake to pass through, but also with reference to their proper handling when actually making the transit.

I have submitted to Capts. Kelly and Nelson, the nautical assessors, who kindly sat with me in this case, my conclusions from the testimony as to the space in the channel between the starboard side of the raft and the American shore through which the Britannic and her tow were invited to pass, and also the dimensions and unmanageable character of the raft, and upon these facts, as established, have asked their opinion as to whether the channel open to the Britannic and her tow was reasonable and sufficient, and whether, under all the circumstances of the case, the master of the Niagara managed his tug in a seaman-like manner. They have answered both questions in the negative, which advice fully meets with my concurrence. A decree may be prepared for the libelants in accordance with this opinion, and a reference to H. F. Carleton, as commissioner of the circuit court, to take testimony and assess the damages.